1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10
11
12
13
14
15
16

BRUCE TITUS and LINDA TITUS, husband
and wife; and BLT INVESTMENTS, LLC, a
Washington Limited Liability Company,

        Plaintiffs,

      v.

BANK ONE, NA, a National Banking
Association, with its main office in Chicago,
Illinois,

        Defendant.

Case No. C04-5102FDB

ORDER GRANTING BANK ONE'S
MOTION FOR SUMMARY
JUDGMENT and DENYING
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

**INTRODUCTION**

17
18
19

      In this case, Plaintiffs allege fraud, misrepresentation, violation of the anti-fraud provisions of the Commodities Exchange Act in connection with certain loan and interest rate swap transactions. Motions for summary judgment have been filed by both parties.

20
21
22

      Plaintiffs move for summary judgment arguing that Bank One breached its duties to plaintiffs by misrepresenting and concealing material facts and by taking secret profits in the context of a special advisory relationship and Bank One violated Washington's Consumer Protection Act.

23
24
25

      Defendant moves for summary judgment arguing that (1) Plaintiffs' conduct, representations, and affirmations bar his claims; (2) Plaintiffs cannot in any event establish the essential elements of

26

ORDER - 1

1  their claims of misrepresentation, breach of fiduciary or quasi-fiduciary duty, violation of the

2  Washington Consumer Protection Act, or claims under the Commodities Exchange Act; and (3)

3  Plaintiffs' claims are barred by unclean hands.

4       Plaintiffs (hereafter also referred to collectively as Titus) are the sole members of BLT

5  Investments, and Plaintiffs either directly, through BLT, or other entities operate businesses for the

6  sale of new and used automobiles in Pierce and Thurston Counties, Washington.  In July 2000,

7  Plaintiffs borrowed $2,900,000 from Bank One at a variable rate of interest based upon the LIBOR

8  rate in effect from time to time.  At about the same time, BLT borrowed $8,400,000 from Bank One

9  at the same interest rate.  Plaintiffs allege that a material consideration on these loans was the interest

10  rate and whether they would be fixed rate or adjustable, as interest rates had fluctuated substantially

11  during the period prior to the making of these loans.  Shortly prior to the closing of the loans,

12  Plaintiffs allege that Defendant's commercial loan officer suggested to the Plaintiffs that they

13  consider interest rate swap transactions with regard to each loan as a means of reducing the interest

14  rate risk inherent in the loans, among other advantages.  On July 17, 2000, Plaintiffs entered into

15  interest rate swap transactions for both of the above-mentioned loans.

16       In 1999, 2000, and 2001, Bank One extended financing, including  flooring plans, to

17  automobile dealerships owned by Titus.  These loans enable the dealerships to purchase new

18  automobiles form the manufacturer, which are then sold to customers.  Under the "Flooring

19  Agreements," Titus agreed to repay Bank One's flooring loans immediately upon Titus's receipt of

20  funding for the sale of cars to customers, and the dealer is required by these "flooring" agreements to

21  "act in a fiduciary capacity as to Lender with regard to the receipt and collection by Dealer of the

22  sales price of each Floored Item ..."  (Whitney Decl. p. 2.)

23       In May 2002, Kathleen S. Whitney, a Bank One vice president working in the Phoenix,

24  Arizona office and who, as a regular part of her duties, conducts audits of dealerships, was

25  concerned about only receiving summary information about the number of vehicles sold and paid for

26  ORDER - 2

1   to verify terms of the flooring agreement. (Whitney Decl. p. 2.)  The summaries would show that

2   vehicles were told to customers but that the customer had not yet paid for the vehicle through

3   financing or otherwise, and there was insufficient detail to conduct a proper audit.  Therefore, on

4   May 22, 2002, Whitney requested a current report from Bill Brown, the comptroller for the Titus

5   dealerships.  (Whitney Decl. p. 3.)  Kathleen Whitney received a detailed receivables report that had

6   not previously been provided on previous audits.  This report divulged multiple transactions entering

7   payments and backing them out without explanation and revealed that the Titus dealerships had

8   received the money and had held it for its own purposes, contrary to the express fiduciary obligations

9   under the Dealer Flooring Agreement.  (Whitney Decl. pp. 3-4; Dx 62, examples of manipulated

10   entries.)  Bank One discovered that at that time, more than $1.1 million dollars in funds that were

11   held in trust for Bank One had been diverted.  (Whitney Decl. p. 4.)

12        Upon this discovery, Bank One demanded full and immediate payment of the diverted "out-

13   of-trust" funds and issued a notice of default to Titus under all of its outstanding agreements and

14   transactions, including the flooring loans, the variable rate commercial loans, and the interest rate

15   swap transactions.  (Whitney Decl. p. 4; Dxs 39 and 40.)  At Titus's request, however, Bank One

16   allowed Titus to continue making payments on the swap rather than pay the early termination

17   economic value (which resulted from a decline in interest rates).  (Whitney Decl. pp. 4-5.)  Also,

18   when Nissan Motors Acceptance Corp. declined to provide financing to Titus unless Bank One

19   subordinated its security interest to NMAC's, Bank One did agree to give up its first lien position on

20   the property, although it had no obligation to do so.  (Whitney Decl. p. 5.)

21        The swap transactions at issue in this lawsuit were not Titus's first interest rate swap.  Titus

22   and five others formed an entity called Fife Hunting Club LLC (LLC) to develop real estate on which

23   Titus would operate a car dealership.  (Titus dep. at 81:1-7.)  In this regard Mr. Rob Peterson, a

24   Bank One interest rate swap specialist met with the LLC group and explained how interest rate

25   swaps worked.  (Titus dep. at 87:9–88:17.) Thereafter, the LLC entered into a $6 million

26   ORDER - 3

1   commercial financing transaction with Bank One.  (Dx 2-7.)  This transaction is not at issue here.

2          Bank One makes a compelling and persuasive case in support of its motion for summary

3   judgment.  Based on the evidence and arguments presented in its memoranda and attachments and

4   referenced below, Bank One's motion for summary judgment is granted.  Consequently, Plaintiffs'

5   motion for summary judgment is denied.

6                              **SUMMARY JUDGMENT STANDARD**

7          Summary judgment is proper if  the moving party establishes that there are no genuine

8   issues of material fact and it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  If the

9   moving party shows that there are no genuine issues of material fact, the non-moving party must go

10  beyond the pleadings and designate facts showing an issue for trial.  *Celotex Corp. v.  Catrett*, 477

11  U.S. 317, 322-323 (1986).  Inferences drawn from the facts are viewed in favor of the non-moving

12  party.  *T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 630-31 (9th Cir. 1987).

13         Summary judgment is proper if a defendant shows that there is no evidence supporting an

14  element essential to a plaintiff's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).   Failure of

15  proof as to any essential element of plaintiff's claims means that no genuine issue of material fact can

16  exist and summary judgment is mandated.  *Celotex*, 477 U.S. 317, 322-23 (1986).  The nonmoving

17  party "must do more than show there is some metaphysical doubt as to the material facts."

18  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

19                                      **ARGUMENTS**

20      *A.  Titus's Representations, Conduct, and Affirmations*

21         The Agreements entered into by the parties on July 17, 2000 (Defendant's Ex. 29 & 38

22  [Hereafter DX #]) expressly state (p. S-3, Part 3 (e)) that New York state law governs the

23  Agreements.  Under New York state law, the elements of estoppel are as follows:

        1.      False representation or concealment of material facts;
        2.      Intention that such conduct will be enacted upon by the other party; and
        3.      Knowledge of the real facts.

26  ORDER - 4

The party asserting estoppel must show with respect to himself:

>    4.    Lack of knowledge of the true facts;
>    5.    Reliance upon the conduct of the party estopped; and
>    6.    A prejudicial change in his position.

Defendant argues that Titus entered into the interest rate swap agreements – which agreements contained language that Titus was not relying on any representations by Bank One – that Titus then entered into a Subordination Agreement of October 9, 2002, and that Titus entered into the October 24, 2002 Guarantor's Addendum to the Subordination Agreement.  Bank One argues that each of these actions independently bar the Tituses' claims.

Plaintiffs argue that Bank One cannot prove by clear, cogent, and convincing evidence that the Tituses intended Bank One to rely upon the disclaimer of advisory services or that Bank One lacked "true knowledge of the facts" as Bank One affirmatively represented in writing that it was providing "timely advice" with a "distinct client focus" in the context of an "advisory relationship." Plaintiffs argue that only specially trained persons can understand the swap documents and that the Bank One employees who discussed the swaps with the Tituses did not themselves fully understand the provisions and terms in the swap documents.  Moreover, Plaintiffs state that a Bank One employee said that the swap documents were fourteen pages of legalese that would be difficult to understand.  Plaintiffs contend they were dependent upon Bank One to explain the swap provisions.

Plaintiffs' arguments are unavailing.  The five pages of swap documents, which comprise  the Schedules to the Master Agreements of July 17, 2000, are written in plain English, and Part 4 contains the representations and warranties that each party makes to the other including the statements that:

>    It is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the other party to this Agreement, other than the representations expressly set forth in this Agreement, each Credit Support Document and in any Confirmation;
>
>    It has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and has made its own

ORDER - 5

investment, hedging and trading decisions (including decisions regarding the suitability of any Transaction pursuant to this Agreement) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other party to this Agreement;

It has a full understanding of all the terms, conditions and risks (economic and otherwise) of this Agreement, each Credit Support Document and each Transaction, and is capable of assuming and willing to assume (financially and otherwise) such risks;

It is entering into this Agreement, each Credit Support Document and each Transaction for the purposes of managing its borrowings or investments, hedging its underlying assets or liabilities or in connection with a line of business, and not for purposes of speculation;

(Dx 29 and 38, p. S-4.) These provisions are entirely inconsistent with Plaintiffs' allegations.

Moreover, Titus's deposition statements contradict his allegations as well. Titus was asked about the first paragraph quoted above – about not relying on the other party for advice – whether that statement was true when he made it, and Titus said, "No, that's false." ( Titus dep. at 143.) Titus said he was making a false statement "because I didn't read it." Titus was asked about the second paragraph quoted above – regarding his having consulted with his own advisers – whether it was true when he made it, and Titus said, "No." (Titus dep. at 145.) When asked whether he told anyone he was making a false statement, Titus said, "No, because I didn't read it." (Titus dep. at 143.) Titus made these statements as to both swap agreements. (Titus dep. at 145.) Titus also stated that the representations made in the third paragraph quoted above – concerning Titus having a full understanding of the terms and risks – was also false when he made it, and he said nothing about it to the Bank. (Titus dep. pp. 147-48.) As to the last paragraph quoted above – entering into the Agreement to manage borrowings and to hedge and not for speculation – Mr. Titus stated that his representation there was true, "Yeah. I wasn't doing it for purposes of speculation at all." (Titus dep. p. 149.)

In response to the question, "Did anyone at Bank One tell you you should not read the ISDA agreements or the schedules to those agreements, Exhibits 29, 30, 37 and 38?" Titus said, "No." "No

ORDER - 6

1  one told me that." (Titus dep. p. 149.)

2      Titus testimony reveals that although he did not read the document, he did understand the

3  purpose for which he entered into the Agreements:  to  manage his borrowings or investments, to

4  hedge underlying assets or liabilities or in connection with a line of business, and not for purposes of

5  speculation.  The representations and warranties were made for the inducement of each of the parties

6  to enter into the agreement, and one party's subjective intent is not controlling.  *See Retail Clerks*

7  *Health & Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 943-44, 640 P.2d

8  1051 (1982)(unexpressed subjective intent irrelevant.).  Titus admitted to not reading the

9  agreements; there is no evidence to support the contention that the representations and warranties

10  were obtained through fraud by Bank One.

11      Titus then entered into the Subordination Agreement of October 9, 2002 and expressly

12  represented that he had continuing "outstanding indebtedness under ... the ISDA Master Agreements

13  and related Schedules, Transactions and Confirmations." (Dx 52 at 2.)

14      Finally, Titus expressly acknowledged, represented and warranted to Bank One in October

15  2002 that his interest rate swap obligations "are and remain valid and enforceable in accordance with

16  their terms." (Dx 53 at 5, item 3.)

17      Bank One has satisfied the elements of the estoppel defense, or, alternatively, shown a waiver

18  of Plaintiffs' claims, and Plaintiffs have failed to make a sufficient showing to defeat this defense on

19  summary judgment.  Plaintiffs entered into the agreements where there was a plain statement that

20  they were not relying on Bank One, that they were relying on their own judgment and their own

21  advisers.  When Titus was asked whether he wanted more time to review the Agreements, Titus said,

22  "No.  We were pretty excited about getting it taken care of." (Titus dep. at 150.)

23      A release is not required for waiver; waiver is "unilateral" conduct of any kind that manifests

24  the intention to relinquish a right.  *Kessinger v. Anderson* 31 Wn.2d 157, 168-69 (1948).  Titus even

25  directly stated that the swap agreements "are and remain valid and enforceable in accordance with

26  ORDER - 7

1   their terms" and that "there is and will remain certain outstanding indebtedness" to Bank One. (Dx

2   53.)  While Titus asserts that the representations were for Nissan Motor Acceptance Corp.'s

3   (NMAC's) benefit, Bank One was a necessary party to the Subordination Agreement and Titus made

4   the same admission in the separate Addendum to which only he and Bank One were parties (Dx 53,

5   third page: "There is and will remain certain outstanding indebtedness and other obligations to Bank

6   One under the Loan Documents.").  Mr. Titus acknowledged that the "Loan Documents" included

7   the swap agreements (Titus dep. at 213:23– 215:8) and demonstrated his understanding of the

8   meaning and significance of the provision.  (Titus dep. at 220:13 – 222:13.)

9          Also, when Plaintiffs entered into the subsequent Subordination Agreement of October 9,

10  2002 and the Guarantor's Addendum to the Subordination Agreement on October 24, 2002,

11  Plaintiffs ratified the prior swap agreements.  Titus admitted that he knew in August 2001 the basis

12  for his current action –(Titus dep. at 187; 184:20 – 185:6; 187:11-188:18.) Yet, in October 2002,

13  Titus testified that as to the Bruce and Linda Titus swap agreement, he made an amendment that

14  resulted in a new interest rate:

15              Yes, because I talked to Rob Peterson on that and asked him, "wouldn't this
            be prudent to do if you were" – "if they're going to give you the money and you're
16          going to" – " and they want you to pay down the swap, wouldn't it be more beneficial
            for me to pay down the lesser of the two because I might" – "the interest rates might
17          come up and that one might disappear a lot quicker?"
                He goes, "well, yeah, that makes perfect sense, plus your rate will come down
18          because they'll redo the swap." or whatever it was.

19  (Titus dep. at 203.)  At the time of this modification, Plaintiffs made no assertion that the swap

20  agreement was unenforceable, and Titus agreed that he was playing the interest rate game. (Titus

21  dep. at 204-05.)

22         As stated earlier, the interest swap agreements at issue herein were not Titus's first

23  participation in such agreements.  The Fife Hunting Club LLC (LLC) involved such an agreement

24  wherein Bank One claimed the LLC had failed to comply with loan covenants.  A settlement

25  agreement was reached between the LLC and Bank One.  Plaintiff argues that the LLC settlement

26  ORDER - 8

1    agreement did not waive any of Plaintiffs' possible claims against Bank One.  Defendants do not

2    argue otherwise.  The LLC settlement was made after March 2003, when Titus first made allegations

3    about his swap transactions.  (Titus dep. pp. 30-33; DX 24 (March 12, 2003 letter from Tituses'

4    attorney.) Bank One agrees that the Fife Hunting Club (FHC) settlement agreement contains a

5    release of the FHC claims but there is no release of the claims he now pursues.  Moreover, the FHC

6    settlement agreement does not waive, modify, or limit in any manner any defense Bank One has to

7    Titus's claims here.  (Ex. A to Bank One Reply.)  Plaintiffs' argument as to the LLC settlement

8    agreement affecting Bank One's claims in the transactions at issue here fail.

9        Plaintiffs have failed to rebut Bank One's showing on defenses of estoppel, waiver, and

10   affirmation.

11       **_B.  Claims Regarding Misrepresentation, Fiduciary Duty, Washington CPA_**

12           **1.  Misrepresentation**

13       Defendant argues that Plaintiffs cannot establish two elements of their misrepresentation

14   claim: justifiable reliance and a false statement by Bank One.  Bank One argues that, as a matter of

15   law, Titus clearly represented that he was relying upon himself and his other advisors in deciding to

16   enter into the swap transactions, (Dx 29 and 38, at S-3 to S-4.)

17       A party who states in a written agreement that he is not relying on any representation by the

18   other party made outside the agreement cannot establish justifiable reliance on any alleged

19   misrepresentation by the other party made outside the contract.  *E.g., Paracor Finance, Inc. v.*

20   *General Elec. Capital Corp.*, 96 F.3d 1151, 1159-60 (9th Cir. 1996).  A party who states in a written

21   agreement that he is entering into that agreement based on his own independent counsel and

22   judgment cannot establish justifiable reliance on representations by the other party made outside that

23   agreement.  *Bank of the West v. Valley Nat'l Bank of Ariz.*, 41 F.3d 471, 477-78 (9th Cir. 1994).

24   "To hold otherwise would be to say that it is impossible for two businessmen dealing at arm's length

25   to agree that the buyer is not buying in reliance on any representations of the seller as to a particular

26   ORDER - 9

1   fact." *Danaan Realty Corp. v. Harris*, 184 N.Y.S.2d 599, 604 (N.Y. 1959).

2       Bank One argues that Titus' failure to exercise ordinary diligence precludes reasonable

3   reliance.  "Where a party has the means to discover the true nature of the transaction by the exercise

4   of ordinary intelligence, and fails to make use of those means, he cannot claim justifiable reliance on

5   defendant's misrepresentations."  *Stuart Silver Assocs. v. Baco Dev. Corp.,* 665 N.Y.S.2d 415, 417

6   (App. Div. 1997).

7       Bank One also argues tat there was no false statement, although Titus alleges four

8   misrepresentations: (1) promise to provide comprehensive and expert "advisory services."  This is

9   from an informational brochure about interest rate swaps and Bank One's Global Derivative

10  Products group that Titus himself described in July 2000 as "propaganda" and which he says he

11  never saw until the day he entered into the interest rate swap agreements.  (Titus dep. at 156.21-

12  157:23.)  While the brochure describes interest rate products – which is what Titus contracted for –

13  it also describes other products and advisory services – which Titus did not buy or engage Bank One

14  to provide.

15      (2) No prepayment penalties.  Bank One argues that the above mentioned brochure upon

16  which Titus relies does provide for a prepayment cost calculated based on current economic value.

17  (Dx. 43.)

18      (3) No fees associated with the swap transactions.  Bank One never suggested the deal was a

19  not-for-profit venture, it recorded income from the life of the transaction, booked at the outset.

20  Bank One undisputedly funded the full $11.3 million that Titus borrowed, without deducting fees,

21  points, or the like, but $3,758.00 of the funds was disbursed for environmental assessments, legal

22  fees, and the like.  (Robbins Decl. ¶ 6, Ex. C; York Decl. ¶ 10.)

23      (4) Bank One personnel were not licensed to market, promote and sell derivatives.  Bank One

24  argues that this assertion has no basis, because there is no requirement that Mr. Peterson or other

25  Global Derivative Products (GDP) personnel have a license to do so.

26  ORDER - 10

1    Plaintiffs attempt to distinguish the case law cited by Bank One, asserting that Micki Robbins

2 and Bank One had a long and close relationship with the Tituses prior to the swap transactions, that

3 the parties' access to information and ability to understand that information was grossly

4 disproportionate, that they did not rely on independent experts because Bank One's "elaborate

5 charade induced them to belief [sic] that independent advice was totally unnecessary." Also, Bank

6 One never warned Tituses that they could not rely on it for advice. Plaintiffs argue that the

7 International Swaps Derivatives Association (ISDA) Master Swap Agreement "is a profoundly

8 complex legal document that simply cannot be understood by anyone lacking exceptional expertise

9 and training." Tituses assert that "Bank One assured them they already had the benefit of its [Bank

10 One's] own extraordinary expertise."

11    Plaintiffs' attempts to distinguish Bank One's case law fail for the reasons stated by Bank

12 One in its reply. For example, *In re Adler, Coleman Cleaning Corp.*, 263 B.R. 406, 489 (Bankr.

13 S.D.N.Y. 2001), states that a party "may rely on a representation without undertaking to investigate

14 if the representation related to matters uniquely within the defendant's knowledge and plaintiff has

15 no independent means available to ascertain the truth." The Tituses could have discovered all they

16 needed to know about the swap agreements had they only read the agreements, and they certainly

17 had access to advisers who could help them. The Tituses simply did not avail themselves of the

18 means available to them to help them to understand the agreements. Titus's admitted failure to read

19 the agreement is fatal to his claim that the disclaimers have no effect. *Harrington v. Hassan*, 743

20 N.Y.S.2d 684, 690 (Civ. Ct. 2002). Bank One has demonstrated that Plaintiffs cannot establish the

21 element of justifiable reliance, and Plaintiffs have failed to carry their burden of demonstrating a

22 genuine issue of material fact on this issue on this motion for summary judgment.

23    Defendants have also demonstrated that Plaintiffs cannot establish a second element on their

24 misrepresentation claim – that there was a false statement. There is no dispute that the Bank earned

25 income on the fully-disclosed interest rate to which Titus agreed, and the Court agrees that it is

26 ORDER - 11

1    simply unreasonable to believe that Bank One had no financial interest in the transaction.  Plaintiffs

2    have failed to demonstrate a genuine issue of material fact as to any of the other alleged false

3    statements mentioned above, and their arguments fail for the reasons advanced by Bank One.

4                               **2.  Fiduciary Duty**

5          Bank One argues that Titus entered into a contract that expressly and unambiguously

6    disclaims that Bank One is acting as Titus's agent, fiduciary or otherwise. .  In *Republic Nat'l Bank*

7    *v. Hales*, 75 F. Supp.2d 300, 317 (S.D.N.Y. 1999), the Court held as a matter of law that there is no

8    fiduciary duty between a bank and a borrower; rather, the relationship is that of a creditor and a

9    debtor.  Moreover, argues Bank One, there is no evidence of a special relationship such that Bank

10   One owed Titus any fiduciary or quasi-fiduciary duty.  The Court in *Republic Nat'l Bank* stated: "the

11   authorities are rather clear that an action for fraud may not lie in New York where the complaining

12   party had access to the information at issue ... ."  Titus could have reviewed his obligations himself

13   or with his own advisor, and he could have investigated the risks of this type of loan, but he did not.

14   Also, while Bank One does offer advisory services, Titus did not engage Bank One to provide them.

15         Plaintiffs argue that Exhibit 1 to the First Amended Complaint promised "timely advice," a

16   "distinct client focus" in the context of an "advisory relationship," and the Tituses reasonably

17   believed that Bank One was providing them with advisory services, in part because of their close

18   five-year relationship with Micki Robbins, Bank One's employee.  Plaintiffs also point to Bank One's

19   vastly superior knowledge.

20         Plaintiffs' argument fails.  The Complaint Exhibit 1 upon which Plaintiffs rely is a document

21   entitled "Global Derivative Products" and it describes the products and their advantages.  It

22   advertises various products and services such as "Strategic Risk Management Advisory,"

23   "commodity and weather derivatives," transactions involving "Foreign Currencies," and Titus

24   described it as "propaganda." (Titus dep. p. 157.)  There is no evidence that Plaintiffs purchased any

25   other products or services advertised in addition to the swap transactions at issue.   When Plaintiffs

26   ORDER - 12

1    entered into an actual agreement, Plaintiffs disclaimed in plain English the existence of any fiduciary

2    or other advisory or special relationship with Bank One.  (Dx. 19, 38, each at S-4.)  Moreover, Titus

3    is an experienced businessman with an undergraduate degree in finance (Titus dep. p 222–229.);

4    Titus is a wealthy individual (Decl. Micki Robbins, Ex. D.), and he has a longstanding relationship

5    with the Davies Pearson law firm (Garner Decl. Ex. C.); he had a relationship with one CPA firm,

6    which he replaced with Moss Adams at the time of the transactions at issue herein.  Robert L.

7    Hinton, Jr., Tituses' engagement partner at Moss Adams, specialized in accounting and finances for

8    automobile dealerships, and had particular expertise in the use by auto dealers of interest rate swap

9    transactions.  (Hinton dep. at 10:14 – 14:3.).  Mr. Titus had no history with Mr. Rob Peterson, the

10   only Bank One representative whom he alleges provided direction on the swap transaction.  (Titus

11   dep. at 87:9– 88:17.)  There is no showing that Plaintiffs engaged Bank One to provide any services

12   including advisory services, as distinct from loans –  the swap transactions.  In this case, there is an

13   express disclaimer of fiduciary duty, which is valid and enforceable under New York state law and

14   precludes a claim of breach of fiduciary duty.  *Seippel v. Jenkens & Gilchrist*, 341 F. Supp.2d 363,

15   381-82 (S.D.N.Y. 2004).  Importantly, in *Republic Nat'l Bank v. Hales*, 75 F. Supp.2d 300

16   (S.D.N.Y. 1999), a closely analogous case, the Court rejected claims of breach of special duty and

17   misrepresentation by a borrower in a swap transaction.  Bank One has demonstrated that the breach

18   of fiduciary duty claim fails and summary judgment is appropriate.

19                      **3.  Washington Consumer Protection Act**

20          Bank One argues that because New York law applies, claims arising under the Washington

21   statute are barred.  Even so, Bank One argues that Plaintiffs cannot establish the elements of a claim

22   under the CPA.  Bank One argues that Plaintiffs cannot establish that Bank One's conduct has the

23   capacity to deceive a substantial portion of the public or that there is a public interest impact.

24          Plaintiffs argue that Bank One is a large bank that actively markets interest rate swap

25   products in Washington and that it continues to use the same deceptive literature involved in this

26   ORDER - 13

1  case.  Plaintiffs argue that the choice of law provision does not govern as the Tituses were induced

2  to enter the agreements by material misrepresentations.

3          Plaintiffs' argument that the choice of law provision in the agreements fail by reason of

4  misrepresentation is not valid, as the Court has concluded there is no misrepresentation.  The New

5  York choice of law provision is valid and enforceable.

6          Additionally, Plaintiffs cannot establish the essential elements of a CPA claim.  There is no

7  demonstration of a deceptive act by Bank One that has the capacity to deceive a substantial portion

8  of the public.  In *Swartz v. KPMG*, No. C03-1252 (W.D. Wash. 2004), plaintiff asserted deceptive

9  acts in connection with tax planning advice.  The Court stated:

10          The number of consumers who could conceivably find themselves in plaintiff's
           circumstances – looking for a tax savings on millions of dollars of capital gains – is
11          extremely small and unable to qualify as "a substantial portion of the public" under
           any reasonable definition of that term.  As a matter of law, conduct directed toward a
12          small group cannot support a CPA claim.

13  (*Id.* at 10; attached as Ex. B. To Bank One's Reply.)  Interest rate swap transactions with wealthy

14  entities and individuals like Plaintiffs fall outside the class of transactions within CPA's scope.  *See*

15  *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 745, 935 P.2d 628, 635

16  (1997)(experienced businessman was not representative of class of consumers protected under the

17  CPA; Goodyear's acts did not affect public interest as a matter of law); *Pacific Northwest Life*

18  *Insurance Co. v. Turnbull*, 51 Wn. App. 692, 703, 754 P.2d 1262 (1988)(purchasers' history of

19  business experience gave them sufficient sophistication to remove them from the class of bargainers

20  subject to exploitation contemplated by the CPA).  Plaintiffs' claim under Washington's CPA fails.

21                          **4.  Commodities Exchange Act**

22          The Commodities Exchange Act's anti-fraud provision (Section 4b (7 U.S.C. § 6b)) makes

23  unlawful fraud in connection with acts "for or on behalf" of other persons.  Bank One argues that

24  here, Bank One did not act as Titus's principal, and there is no evidence to the contrary.  Bank one

25  was a party, a principal, in the interest rate swap agreement with Titus who was the other principal in

26  ORDER - 14

1   this transaction.  Bank One argues that additionally there was no misrepresentation, no willful

2   deception, and no justifiable reliance.

3          Plaintiffs argue that the CEA's anti-fraud protection is not limited to broker/customer

4   relationships.

5          The Court has already concluded that there was no misrepresentation, no wilful deception,

6   and no justifiable reliance.  Even if the CEA is applicable to the transactions herein, for all the

7   foregoing reasons this cause of action fails.

8          ***C. Unclean Hands***

9          Bank One argues that a party who has engaged in inequitable conduct connected to the

10  matters at issue in the litigation is not entitled to equitable relief, and his or her claims are thus

11  barred.  *Coty v. Steigerwald*, 692 N.Y.S.2d 556, 557 (1999).  Because Titus himself has engaged in

12  fraud – a deliberate and long-standing practice of creating false and misleading financial books and

13  records for the purpose of inducing Bank One (and others) to provide him with financing and then to

14  prevent Bank One from learning of default under the financing agreements, including the interest rate

15  swap transactions – his unclean hands bar both a claim for misrepresentation and a claim for breach

16  of fiduciary duty.  *Fattorusso v. Urbanowicz*, 774 N.Y.S.2d 658, 662 (S. Ct. 2004)(granting motion

17  to dismiss claims for fraud, misrepresentation, consumer fraud, and other breaches of duty because of

18  plaintiff's unclean hands); *Ross v. Moyer*, 730 N.Y.S.2d 318, 320 (App. Div. 2001)(reversing

19  summary judgment to plaintiff on claims for beach of fiduciary duty and breach of implied duty of

20  loyalty, because of fact question as to plaintiff's unclean hands).

21         Plaintiffs contend that the "erroneous monthly financial statements" did not cause Bank One

22  any damages because Plaintiffs cured their out-of-trust position, and a "sinner" is not repelled from

23  courts of equity;  a claimant is not disqualified from obtaining relief where his own fraud has no

24  relation to the transaction about which he complains.  Plaintiffs cite *Dollar Systems, Inc. v. Avcar*

25  *Leasing Systems, Inc.*, 890 F.2d 165 (9th Cir. 1989).

26  ORDER - 15

1    Bank One argues that upon discovery of Titus's scheme and the ensuing default requiring

2    Titus to pay off his loans and either pay the early termination payment associated with the economic

3    value of his swap as of 2002, or continue to make monthly payments under the swap agreements,

4    led directly to Plaintiffs' claims: Titus states that his essential complaint is that his swap obligations

5    continued even after payoff of the underlying loan.  (Titus dep. at 30:14–24.)  *Dollar Systems* was

6    not a situation in which the unclean hands themselves directly led to assertion of the claims against

7    which the defense is asserted; also, the defendant therein acted negligently and not with the purpose

8    to defraud.  Here, Titus's bank fraud was purposeful, continued for approximately two years, and

9    once it was discovered by Bank One, Titus went on the offensive and asserted his allegations against

10   Bank One.  The facts giving rise to the unclean hands defense are not disputed.

11   The Court agrees that the doctrine of unclean hands applies here to bar Plaintiffs' claims.

12   **CONCLUSION**

13   There being no material facts in dispute, Bank One is entitled to judgment as a matter of law.

14   Bank One has established facts support the defenses of estoppel, ratification, and waiver, and

15   Plaintiffs have failed to establish a genuine issue of material fact as to these defenses.  Plaintiffs have

16   also failed to establish a genuine issue of material fact as to the misrepresentation and justifiable

17   reliance claims.  The Washington CPA claim fails as New York state law applies, and, even if it did

18   apply, Plaintiffs cannot establish an essential element of the claim.  Neither are Plaintiffs able to

19   establish the elements of their CEA anti-fraud claim.  Finally, Plaintiffs engaged in bank fraud by

20   fraudulently preparing and submitting to Bank One fraudulent financial statements.  Plaintiffs'

21   unclean hands bar Plaintiffs' claims.  Plaintiffs' claims must be dismissed.

22   ACCORDINGLY,

23

24   IT IS ORDERED:

25   (1)  Bank One's Motion for Summary Judgment [Dkt. # 38] is GRANTED and Plaintiffs'

26   ORDER - 16

1    claims and cause of action are DISMISSED.

2           (2) Plaintiffs' Bruce Titus and Linda Titus and BLT Investments, LLC Motion for Summary

3    Judgment [Dkt. # 33] is DENIED.

4           (3) The Clerk shall enter judgment in favor of Defendant Bank One, NA.

5

6           DATED this 20th day of May, 2005.

7

8                                        FRANKLIN D. BURGESS
                                         UNITED STATES DISTRICT JUDGE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   ORDER - 17